U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 NOV 19 PM 3:37

CLERK
BY _____
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

KELLY C. (MAGINNIS) MILLARD, )
                              )
    Plaintiff,                )
                              )
    v.                        )   Case No. 5:13-cv-00261
                              )
COMMISSIONER OF SOCIAL        )
SECURITY,                     )
                              )
    Defendant.                )

**OPINION AND ORDER**
**(Docs. 12 & 16)**

Plaintiff Kelly C. (Maginnis) Millard[1] requests review and remand of the decision of the Commissioner of Social Security denying her application for disability insurance benefits. *See* 42 U.S.C. § 405(g). Pending before the court are Millard's motion to reverse the Commissioner's decision (Doc. 12) and the Commissioner's motion to affirm the decision (Doc. 16).

    I.    **Background**

Millard was thirty-four years old on her alleged disability onset date of June 17, 2000. She has earned her GED and completed courses in advanced typing and data entry. She has work experience as a sales clerk at a lumberyard, a kitchen helper at an assisted-living facility, and an animal caregiver at a dog kennel. She has two children, who were no longer in her custody as of July 2009. (AR 62-63.) She volunteers approximately one hour a week as a substance abuse recovery coach in her community. (AR 821.)

On June 15, 2000, Millard was involved in a motorcycle accident that resulted in serious injuries to her right ankle and back. (AR 411-13.) X-rays showed that she sustained an open tibia fracture and an open markedly comminuted distal fibula fracture, as well as a spinal fracture

---

[1] Plaintiff was married in June 2014 and changed her last name from Maginnis to Millard. (Doc. 19 at 1.)

1

at T9-T10. (AR 411, 426, 472-73.) She underwent emergency surgery for the ankle fracture. (AR 415-16). Over the years since the accident, Millard has received treatment for chronic ankle and back pain. (AR 17.)

In addition to her ankle and back pain, Millard has hearing problems and asthma. (AR 63.) She has been diagnosed with panic attacks with agoraphobia and major depressive disorder. (AR 580).

Millard has also been diagnosed with cocaine abuse in full remission. (*Id.*) The record shows that she used cocaine in 2004 and 2005, and sold cocaine in 2006. (AR 63.) She was eventually arrested for the sale of cocaine and was incarcerated from May 20, 2008 until October 2, 2009. She worked part-time at the prison's print shop using machines to print papers, invitations, and business cards. (*Id.*)

On February 20, 2008, Millard applied for social security disability insurance and supplemental security insurance. Both her initial application and her request for reconsideration were denied. Following a hearing in July 2010, Administrative Law Judge (ALJ) Ruth Kleinfeld ruled on October 6, 2010 that Millard was not disabled. Millard appealed to this court, which remanded the case for another hearing on the grounds that substantial evidence did not support portions of the ALJ's assessment of the medical opinions and her residual functional capacity determination. (AR 80.)

On June 18, 2012, Millard filed a new application for supplemental security income alleging an onset date of October 7, 2010. Her application was denied initially and on reconsideration. Her 2012 claim was consolidated with the prior claim. ALJ Kleinfeld conducted a hearing on May 22, 2013. (AR 813.) On July 26, 2013, she again ruled that Millard was not disabled. (AR 31.) Having exhausted her administrative remedies, Millard filed her complaint with this court on September 26, 2013. (Doc. 3.)

## II.     The ALJ's Decision

The Commissioner uses a five-step sequential process to decide whether an individual is disabled. See *Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). At the first step, the ALJ determines if the individual is engaged in "substantial gainful activity." 20 C.F.R.

§§ 404.1520(a)(4)(i); 416.920(a)(4)(i). If not, the ALJ then considers whether the individual has a severe medically determinable physical or mental impairment or combination of impairments that has lasted or is expected to last continuously for at least twelve months. *Id.* §§ 404.1520(a)(4)(ii); 416.909; 416.920(a)(4)(ii). At the third step, the ALJ considers whether the individual has an impairment that "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix I. *Id.* §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). An individual is presumed to be disabled if he or she has a listed impairment. *Id.*; *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the individual is not presumptively disabled, the ALJ then considers the individual's residual functional capacity (RFC), which means the most work the claimant can still do despite her impairments based on all the relevant medical and other evidence in the record, and whether the individual can still perform his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1545(a); 416.920(a)(4)(iv). Finally, the ALJ considers whether the individual can perform "any other work." *Id.* §§ 404.1520(a)(4)(v), (g); 416.920(a)(4)(v), (g). The claimant bears the burden of proof at steps one through four. *Butts*, 388 F.3d at 380-81. At step five, there is "a limited burden shift to the Commissioner," requiring her to show only "that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

Applying this framework, the ALJ first determined that Millard had not engaged in substantial gainful activity since June 17, 2000. The ALJ next determined that Millard had the following severe impairments: "osteoarthritis right ankle s/p fractures with post-traumatic arthritis; mechanical back pain s/p thoracic (T9/T10) spine fracture; anxiety disorder; affective disorder (variously diagnosed); and substance abuse disorder (cocaine) in sustained remission." (AR 17.) The ALJ found that although Millard had mild bilateral hearing loss requiring hearing aids and had received some treatment for asthma and headaches, these impairments did not result in significant functional limitations and were therefore nonsevere. (AR 18.) The ALJ also found a lack of evidence to support the consultative psychological examiner's hypothesis that some of Millard's symptoms might be caused by attention deficit hyperactivity disorder. (*Id.*)

Proceeding to the third step, the ALJ determined that Millard's impairments did not meet or medically equal the severity of a listed impairment. Specifically, the ALJ determined that

Millard did not meet the criteria for listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 12.04 (affective disorders), 12.06 (anxiety related disorders) or 12.09 (substance addiction disorders). (AR 18-22.)

The ALJ then determined that Millard had the RFC to perform sedentary work but that she must be able to alternate positions at will from sitting to standing. Millard was unable to climb ladders, ropes and scaffolds, but could climb stairs and ramps occasionally and perform occasional postural activity as well as occasional pushing and pulling with her right lower extremity. The ALJ stated that Millard must avoid concentrated exposure to extreme cold and even moderate exposure to hazards. She could perform simple, routine tasks. (AR 22-29.)

The ALJ found that Millard was unable to perform past relevant work because it exceeded her RFC. (AR 29.) Based on the vocational expert's testimony at the hearing, the ALJ determined that Millard was capable of performing jobs that exist in significant numbers in the national and local economy, including document preparer, addresser, and surveillance system monitor. (AR 30.) She concluded that Millard had not been disabled from the alleged onset date through the date of her decision. (AR 31.)

### III. Standard of Review

This court reviews the administrative record *de novo* to determine whether the Commissioner's decision is supported by "substantial evidence" and uses the correct legal standard. *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002); see also 42 U.S.C. § 405(g). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Poupore*, 566 F.3d at 305 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Where there is substantial evidence to support either position, the determination is one to be made by the factfinder. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). In reviewing a decision of the Commissioner, this court must be mindful of the remedial purpose of the Social Security Act. *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## IV. Analysis

Millard argues that the ALJ did not correctly weigh the opinion evidence, and therefore improperly concluded that Millard's right ankle impairment did not meet listing 1.02 and failed to properly consider whether her mental impairments met a listed impairment. She also argues that neither the ALJ's RFC assessment nor her determination of Millard's credibility were supported by substantial evidence.

### A. The ALJ Properly Considered Whether Millard Has a Listed Impairment

Millard first argues that the ALJ erred in determining that Millard did not have a listed impairment under listings 1.02, 12.04, or 12.06.

#### i. Listing 1.02

Listing 1.02 addresses major dysfunction of a joint. To meet this listing, Millard must demonstrate that her ankle impairment results in an inability to ambulate effectively. 20 C.F.R. § 404, app. 1, § 1.02. "Inability to ambulate effectively" is defined in the regulations as:

> [A]n extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

*Id.* § 1.00(B)(2)(b)(1). Some examples of ineffective ambulation include inability to walk without the use of a walker or other assistive device that requires both arms; inability to walk a block at a reasonable pace on rough or uneven surfaces; inability to use public transportation or conduct routine activities such as shopping and banking; and inability to climb more than a few steps at a reasonable pace using a single hand rail. *Id.* § 1.00(B)(2)(b)(2).

In examining whether Millard met the criteria for listing 1.02 due to her ankle injury, the ALJ considered the opinion of Dr. Karen Huyck, who examined Millard in August 2012 at the request of her primary care physician. Dr. Huyck conducted a timed walking test in which Millard walked 733 feet in six minutes, or twenty-eight percent of the distance expected for a person of her age and health. Dr. Huyck observed that Millard had an antalgic gait and that she

5

needed to stop to rest for thirty seconds during her walk. (AR 763.) Dr. Huyck found that Millard was able to climb stairs using a single hand rail. (*Id.*) She noted that Millard showed "varied levels of physical effort" during her tests and stated that "[t]he results of this evaluation may not be a good indication of her current abilities for the areas tested." (AR 760.) She concluded that Millard "appears unable to ambulate effectively, to walk a city block at a reasonable pace on rough or uneven surfaces, or sustain a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living," and thus appeared to meet the criteria of listing 1.02. (AR 758.) However, she stated that "given her multiple SSDI applications, I am referring her for [a] residual functional capacity exam with our occupational therapist to further document her functional impairment."[2] (*Id.*)

Millard argues that the totality of the evidence "supports an inference" that she was unable to ambulate effectively. (Doc. 12 at 13.) She points to the opinion of Dr. Huyck, as well as the treatment notes of Thomas Brudz, PA. Mr. Brudz, a physician's assistant whom Millard visited for treatment of her back pain in 2011, noted that Millard's gait was "antalgic on right due to ankle issues." (AR 699.) Millard also cites her own testimony at the hearing that "[s]tanding, I am unable to stand for a long period of time. I have trouble balancing. I like have to constantly have something to hold onto or lean on." (AR 822.) In addition, Thomas Millard testified that Millard used a cane "on some occasions" and that "when her ankle is really bothering her . . . , if she's up and about, she's either using a railing or the cane, and that affects her in other ways as well, for example, . . . [she] doesn't wish to leave the house with the cane or be seen walking with a cane." (AR 836.)

The ALJ's decision is supported by substantial evidence. While Dr. Huyck opined that Millard appeared to meet the criteria for listing 1.02, she also stated that her evaluation might not accurately reflect Millard's abilities due to her varied levels of effort, thus injecting doubt into her findings. The treatment notes of Dr. Leppman, Millard's primary care physician, consistently report from 2009 to 2011 that Millard exhibited a normal gait despite reporting ankle pain and swelling. (AR 664, 681, 691, 694, 702, 709). Dr. Leppman's July 2010 opinion states that Millard should be able to stand or walk at least two hours in a workday. (AR 648.) Further, as the ALJ noted, Dr. Richard Root observed that Millard seemed to have no difficulty

---

[2] There is no record that an independent RFC exam was conducted.

rising from her chair and walking into the examination room when he met with her in July 2012. (AR 746.) The 2002 opinion of Millard's orthopedic surgeon, Dr. Christopher Meriam, that Millard should be able to perform sedentary work also supports the ALJ's decision. (AR 465.)

While the record certainly shows that Millard complained of worsening ankle pain over time, there is little objective evidence that her ankle impairment caused her to be unable to ambulate effectively. For example, one of the most recent medical records in the file, from May 2013, is a report by Katherine Silta, P.A. describing Millard as a "[h]ealthy-appearing woman who walks with antalgic stiff ankle gait on the right." (AR 801-02.) Silta's report does not indicate that Millard had extreme difficulty walking. Nowhere in the medical record is she described as using a cane, crutches or any other assistive device "that limits the functioning of both upper extremities." 20 C.F.R. § 404, app. 1, § 1.00(B)(2)(b)(1). Millard's own function reports state that she is able to drive, use public transportation, go shopping, and do some house and yard work, all of which are examples of routine ambulatory activities. (AR 312-13, 278-79.) The ALJ was therefore justified in concluding that Millard did not meet the criteria for listing 1.02, which requires "an extreme limitation of the ability to walk." *Id.*

### ii.     Listings 12.04 and 12.06

Millard argues that that the ALJ did not give proper consideration to whether she met the criteria for listings 12.04, affective disorders, or 12.06, anxiety-related disorders. In order to meet the criteria for either of these listings, the claimant must show that his or her affective disorder—such as depression—or anxiety results in at least two of the following symptoms: "[m]arked restriction of activities of daily living"; "[m]arked difficulties in maintaining social functioning"; "[m]arked difficulties in maintaining concentration, persistence, or pace"; or "[r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. § 404 app. 1, §§ 12.04(B); 12.06(B). The claimant may alternatively show that she meets the listing by demonstrating that her anxiety "[r]esult[s] in complete inability to function independently outside the area of [her] home." *Id.* §§ 12.04(C); 12.06(C).

The ALJ determined that Millard had mild restrictions in her daily living, based on Millard's statements in her function report as well as the evaluation of Dr. Richard Root, an agency consulting psychologist. (AR 19-20.) The ALJ determined that Millard had mild

7

difficulties with social functioning, noting that despite Millard's desire to isolate and avoid social interaction, she attended group counseling several times a week, had friends and a long-term boyfriend, and denied any difficulty getting along with others in her function reports. (AR 20.) The ALJ found that Millard had moderate difficulties with concentration, persistence and pace. She found that Millard had medically documented anxiety and panic attacks that credibly limited her ability to maintain focus and concentration. However, the ALJ noted that Millard reported being able to read often, write letters, and play short card games. Dr. Root stated that she generally got back to the topic at hand with only mild redirection. Finally, her primary care provider Dr. Leppman consistently found that she had an appropriate attention span and normal ability to concentrate. (AR 20-21.) The ALJ found that Millard had not experienced any episodes of decompensation that were of extended duration. (AR 21.) The ALJ relied upon the above sources, as well as opinion evidence from agency psychological consultants Thomas Reilly and Joseph Patalano, in determining that Millard did not demonstrate marked limitations in two or more of paragraph B criteria for listings 12.04, 12.06, or 12.09.

Millard argues that because the ALJ gave little weight to the opinion of her mental health counselor, Ron Treem, and did not review the records from her substance abuse counselor, Matthew Hudson, or the records from nurse practitioner James Walsh, she did not properly consider whether Millard met the criteria for listings 12.04 or 12.06. (Doc. 12 at 11, Doc. 16-1 at 13.)

Treem is a master's-degree-level licensed clinical mental health counselor who began treating Millard for her mental health issues in April 2013. (AR 782-83.) Hudson is a master's-degree-level alcohol and drug counselor who treated Millard from 2009 to 2012 pursuant to her conditions of release from prison. (AR 627.) Walsh is a nurse practitioner who treated Millard once in 2013. (AR 806-07.) None of these individuals is considered to be an "acceptable medical source" under the Social Security regulations, and thus their opinions are not entitled to controlling weight. 20 C.F.R. § 404.1513(a). However, the ALJ may consider evidence from other sources in determining the severity of the claimant's impairments and how they affect the claimant's ability to work. *Id.* § 404.1513(d). The factors considered in determining the weight to give to a treating medical source, such as the length and frequency of the treatment relationship, the consistency of the opinion with other evidence, including evidence provided by

8

the source, and whether the source has a specialty or area of expertise related to the individual's impairments, should also be considered when determining the weight to give to opinion evidence from other sources. SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

The record supports the ALJ's decision to give limited weight to the opinion of Ron Treem, Millard's mental health counselor. In a medical source statement dated May 8, 2013, Treem opined that Millard had "marked" and "extreme" limitations in carrying out instructions and in her ability to interact with coworkers and supervisors due to "bipolar illness exacerbated by chronic pain" and generalized anxiety disorder. (AR 808-09.)

As the ALJ noted, Millard had only begun seeing Treem in April 2013. Apart from the May 2013 medical source statement, the record includes evidence of only one counseling visit between Millard and Treem. (AR 782.) In the treatment notes from that visit, Treem states that Millard has a Global Assessment of Functioning (GAF) score of 75, which indicates only mild symptoms. This GAF score is inconsistent with Treem's finding that Millard had marked to extreme limitations in cognitive functioning. Treem's opinion is also inconsistent with the treatment notes of Millard's primary care physician, Dr. Leppman, who noted in April 2013 that Millard had appropriate mood and affect, was able to articulate well, showed no evidence of hallucinations, delusions, or homicidal or suicidal ideation, demonstrated appropriate judgment and insight and had a normal attention span and ability to concentrate. (AR 775.) Under these circumstances, the ALJ did not err in giving limited weight to Treem's opinion evidence.

The ALJ did not explicitly address the opinion of Matthew Hudson, Millard's substance abuse counselor. The ALJ is required to consider all relevant evidence in an individual's case record, and thus should generally explain the consideration given to non-medical sources such as counselors. SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006). However, any error was harmless, because Hudson's opinion evidence does not contradict the ALJ's findings.

Hudson provided three letters in connection with Millard's application for benefits. The letters state that Millard suffers from anxiety and depression and that these issues "interfere with her functioning" to some unspecified degree. (AR 645-46, 766.) The ALJ's decision accords with Hudson's letters: she found that Millard's anxiety and depression resulted in mild

difficulties in activities of daily living, social functioning, and moderate difficulties with concentration, persistence and pace. (AR 19-20.)

Millard's argument that Hudson's letters support counselor Treem's opinion that she had marked to extreme functional limitations is unpersuasive. Hudson did not supply treatment notes or other records, and his letters offer no assessment of the severity of her limitations.

Millard also argues that the ALJ failed to consider that Treem's opinion was consistent with "the opinion[] from . . . mental health clinician[] [James] Walsh." (Doc. 12 at 10.) Mr. Walsh is a nurse practitioner whom Millard visited in May 2013, just prior to her administrative hearing. In his treatment notes, he states that Millard reported that she was suffering from "anxiety attacks in public" and "often need[s] to leave the store in the middle of shopping even when accompanied by supportive boyfriend."[3] (AR 806.) This is not a medical "opinion"; rather, the notes merely recount Millard's self-reported symptoms. While the notes show that Millard was consistently reporting worsening anxiety to treatment providers in the weeks prior to her hearing, they contain little objective evidence to support Treem's conclusion that Millard's functioning was severely impaired by her anxiety and depression. Indeed, Walsh noted that Millard tested "within normal limits" on a mini-mental status exam. (*Id.*)

Millard also takes issue with the ALJ's comment that it was "not conceivable that [Millard] would be selected to serve as a volunteer resource person if she were as markedly limited as her new therapist suggests." (AR 21.) Millard argues that serving as a volunteer recovery coach for substance abusers is not analogous to employment. (Doc. 12 at 15.) However, the ALJ was entitled to consider all the evidence in the record in determining whether Millard's anxiety and depression resulted in marked limitations in her ability to conduct social activities. Millard's occasional work as a recovery coach was direct evidence of her social functioning and it was appropriate for the ALJ to consider.

Separately, Millard objects to the ALJ's evaluation of the opinion evidence provided by Dr. Patalano, an agency psychological consultant. In 2009, Dr. Patalano reviewed Millard's

---

[3] Millard also incorrectly claims that Walsh stated that "she has been in recovery for some time but has not adequately addressed her mental health issues or physical limitations." (Doc. 12 at 14.) This description actually comes from the medical source statement provided by counselor Treem, which the ALJ considered and gave limited weight.

record and determined upon reconsideration that her mental impairments did not render her disabled. (AR 622.) In 2012, Dr. Patalano again reviewed Millard's record and gave the opinion that she retained the capacity to carry out instructions, interact with coworkers, and could generally sustain the concentration, persistence and pace to work a full-time job. (AR 99.) The ALJ gave substantial weight to Dr. Patalano's opinions, with one exception. Dr. Patalano stated in the 2012 opinion that Millard had "moderate" restriction of activities of daily living and "moderate" difficulties maintaining social functioning. (AR 100.) The ALJ gave limited weight to these latter assessments because she found that the record as a whole did not support them. (AR 21, 28.)

The record supports the ALJ's decision to give limited weight to these aspects of Dr. Patalano's opinion, and to give his opinions substantial weight overall. See 20 C.F.R. § 404.1527(e)(i) ("State agency . . . psychological consultants . . . are highly qualified . . . psychologists . . . who are also experts in Social Security disability evaluation."). The 2009 opinion was supported by the record evidence available to Dr. Patalano, which shows that although Millard suffered from episodes of anxiety and depression, she was repeatedly found by providers to be alert, attentive, and to present a normal affect and appropriate behavior, and that she had friends and worked part-time. (AR 314, 510, 547, 556). Indeed, she emphasized to consulting psychological examiner Richard Root, Ph.D. in 2009 that she was applying for benefits due to her ankle and did not know why she was being evaluated for anxiety. (AR 578.)

Dr. Patalano's 2012 opinion generally conforms with his 2009 opinion. It also conforms with the post-2009 treatment notes of Dr. Leppman, who consistently reported that Millard has a normal attention span and ability to concentrate and behaved appropriately even when she presented as depressed or anxious. (AR 661, 713, 777, 779.) In 2012, Dr. Leppman reported that Millard had anxiety and depression but that her behavior, attention, concentration and ability to relate to others were satisfactory or good. (AR 715). Millard's own function report, completed in July 2012, states that she has no difficulty in getting along with others, and is generally able to follow instructions. (AR 377-78)

The ALJ did not err in giving limited weight to Dr. Patalano's assessment that Millard had "moderate" limitations in social functioning and activities of daily living in his 2012 report. The record supports the ALJ's conclusion that Millard's limitations in these areas were mild at

11

most. Even if the ALJ incorrectly discounted Dr. Patalano's opinion that Millard had moderate limitations in these areas, there was no error, because the ALJ went on to fully analyze the severity of each of the mental impairment criteria and concluded that Millard's mental impairments did not meet a listing. See *Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008) (explaining that finding of "mild" or no limitation and no episodes of decompensation generally means mental impairment is not severe, but if mental impairment is severe, ALJ must analyze criteria to see if claimant meets listing).

Millard argues that Dr. Patalano's opinion evidence should have been given lesser weight because it was inconsistent with and did not consider the opinions of counselors Treem and Hudson and nurse practitioner Walsh. (Doc. 19 at 6.)

Contrary to Millard's argument, Dr. Patalano did consider the opinion evidence provided by substance abuse counselor Hudson in his 2012 report, and his opinion is consistent with Hudson's statements. (AR 99.) Dr. Patalano did not address counselor Treem's opinion, which is understandable, because Treem's opinion postdated Dr. Patalano's. As noted above, Treem's opinion was of limited value due to its internal inconsistency and inconsistency with the record, and his brief treatment relationship with Millard. Thus, Dr. Patalano's opinion is not significantly undermined by the fact that he did not consider Treem's opinion.

Again due to timing, Dr. Patalano did not consider nurse Walsh's May 2013 treatment note. But the information in that note was present elsewhere in the record. Dr. Patalano's opinion discusses Millard's panic attacks and her reports that she often cuts short shopping trips due to anxiety. (AR 99.) His opinion therefore is also not undermined by his failure to consider Walsh's treatment note.

The ALJ properly considered whether Millard met the criteria for listings 12.04 or 12.06. The record supports her determination that Millard did not meet either listing because she did not show that her anxiety or depression caused marked difficulties in at least two of the areas identified in part B of each listing. (AR 19-21.)

## B. The ALJ's RFC Determination Is Supported by Substantial Evidence

Millard argues that substantial evidence shows that her physical and mental limitations are greater than the ALJ found in her RFC determination.

First, Millard argues that the ALJ improperly gave limited weight to the opinion of her primary care physician, Dr. John Leppman, that Millard would need to lie down several hours each day and would likely be absent from work three or more days each month. (AR 27.)

A treating physician's opinion on the nature and severity of the claimant's impairments will generally be given controlling weight. 20 C.F.R. § 404.1527. However, the ALJ is not required to give a treating physician's opinion controlling weight "where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). If the ALJ chooses not to give controlling weight to a treating physician's opinion, he or she must consider various factors in deciding how much weight to give to the opinion. *Id.*; 20 C.F.R. § 404.1527(d)(2). The factors include: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2). The ALJ must explain the weight accorded to the treating physician's opinion. *Id.*

In a July 2010 medical source statement submitted by Dr. Leppman, he checked "yes" next to the following questions: "Would it be reasonable for [Millard] to need to lie down in a reclining position for several hours per day to relieve back and/or ankle pain?" and "[D]o you believe that she could miss 3 or more days of work per month due to symptoms of depression, panic attacks, and/or anxiety?" (AR 673.)

The ALJ did not err in giving limited weight to these portions of Dr. Leppman's opinion, and she adequately explained her reasons for doing so. As Magistrate Judge Conroy found in his prior decision in this case, Dr. Leppman's opinion that Millard needed to lie down for several hours a day was unsupported by any medical evidence and was contradicted by her own function

13

reports. *Maginnis v. Commissioner of Social Security*, No. 5:11-cv-36, Doc. 26 at 10-11 (D. Vt. Mar. 14, 2012) (Conroy, Mag. J.) (AR 71-72.). Further, the record did not support Dr. Leppman's opinion that Millard's depression and anxiety would cause her to miss at least three days of work each month. The record showed that her mental problems were largely situational, that she responded well to medication, and that she generally functioned well in social and occupational situations. (*Id.*) The same reasoning applies here. Dr. Leppman's answers to the two questions on the July 2010 medical source statement are unsupported by other medical evidence and the ALJ was entitled to give them limited weight.

Second, Millard contends that the ALJ's RFC assessment fails to account for limitations arising from her anxiety, depression, and chronic pain. The ALJ considered Millard's pain symptoms at length in her decision. She acknowledged that Millard has "significant arthritic changes to her ankle and that she does experience some mechanical back pain that credibly limits her [ability to] perform physical activity." (AR 25.) However, she found that the record lacked medically documented objective findings or treatment history that would prevent her from doing sedentary work with a sit/stand option. (AR 25.)

The ALJ also gave lengthy consideration to whether Millard's anxiety and depression would limit her ability to perform sedentary work. She considered the opinion of counselor Treem, who opined that Millard had marked to extreme limitations in her ability to carry out instructions and interact with coworkers. The ALJ gave Treem's opinion limited weight because he had only treated Millard for a short time, his conclusions were inconsistent with the record as a whole, and his treatment notes did not support his conclusions. (AR 29.) As discussed above, her decision to discount Treem's opinion was adequately explained and was supported by the record.

Millard claims that the ALJ failed to consider the treatment note of James Walsh, NP, who saw Millard on one occasion in May 2013. Any error here is harmless. As the court has previously explained, the treatment note reflects Millard's self-reported symptoms and does not include any diagnosis. Rather, Walsh's note supports the ALJ's RFC assessment, because it states that Millard achieved normal results on a mini-mental status examination.

### C. The ALJ's Assessment of Millard's Credibility Is Supported by Substantial Evidence

In her analysis of Millard's RFC, the ALJ recounted Millard's testimony regarding her alleged symptoms. The ALJ found that Millard's medically determinable impairments could reasonably be expected to cause her alleged symptoms including ankle and back pain, limited ability to stand or walk for extended periods of time or do other physical activity, need to lie down with ankle elevated to reduce pain, and difficulty concentrating and interacting with others. However, the ALJ found that Millard's statements regarding the intensity, persistence and limiting effects of those symptoms were not entirely credible. (AR 22-23.) Millard argues that the ALJ's credibility determination was not supported by substantial evidence because the evidence showed that she needed to take frequent breaks and lie down during the day to alleviate pain.

The ALJ is required to take the claimant's reports of pain and other limitations into account in determining RFC. 20 C.F.R. § 416.929(c)(3). However the ALJ "is not required to accept the claimant's subjective complaints without question; he [or she] may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

The regulations provide a two-step process for evaluating the claimant's statements regarding his or her symptoms. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* If the answer is yes, the ALJ must then consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (internal quotation marks omitted; alteration in *Genier*). This includes evidence regarding the claimant's daily activities, the nature of his or her symptoms, and any medication and other treatments used to relieve those symptoms. *Id.*; 20 C.F.R. § 416.929(c)(3).

The ALJ clearly identified the reasons for her credibility determination, and these reasons were supported by the record evidence. *See* SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, she noted that Millard received little to no treatment for her ankle injury after 2003, except for pain medication. While the record showed that she suffered from post-traumatic arthritis of the

15

ankle, the ankle had generally healed and Millard's gait and posture were consistently described as normal by her primary care physician. Similarly, although Millard had a medically documented injury to her thoracic spine, the treatment notes showed no tenderness or pain over the area of the injury and showed that she had normal reflexes and strength in her back. Her treatment for both ankle and back pain was limited to prescribed medication, which she voluntarily gave up during prison, suggesting that the pain was not as unbearable as she described. She was assessed as a candidate for ankle fusion surgery, but her physician declined to perform the surgery unless she gave up smoking, which she has not done. (AR 23-25.)

The ALJ also considered Millard's activities of daily living, part-time work including work as a recovery coach, and hobbies, and found that these showed that Millard had the capacity to perform simple routine tasks on a sustained basis. (AR 27.) Millard argues that this was error, because the record shows that she needed to take frequent breaks while performing these activities.

In her pain and function reports, Millard acknowledged that she performs daily activities such as cooking, cleaning, shopping and personal care, but alleged that she needs frequent breaks and is limited by chronic pain in her lower back and ankle. (AR 373-88.) Millard argues that her need for frequent breaks is supported by a 2010 statement provided in connection with the prior hearing by her former employer, Frank Kendall. Mr. Kendall states that Millard worked at his dog kennel socializing puppies "several days a week if she feels able," for about three hours, and needed to sit and rest frequently for twenty minutes to one hour. (AR 339.) She also points to Dr. Leppman's 2010 medical source statement, in which he checked "yes" next to the question "Would it be reasonable for her to need to lie down in a reclining position for several hours per day to relieve back and/or ankle pain?" (AR 673.) Finally, her witness Thomas Millard testified at the 2012 hearing that Millard was unable to go for long walks and "keeps a nice house . . . she does a little bit here and there, and if she has to lay down in between she does." (AR 834.)

The ALJ considered Millard's claim that she needed frequent breaks in order to recline or lie down during the day, and found it to be unsupported by the medical evidence. Her conclusion is supported by the record. As the ALJ noted, Dr. Leppman stated in another medical source statement submitted in 2010 that Millard would be able to stand or walk for about two hours, and sit for about six hours, in an eight-hour day. (AR 648-49.) No other medical source

16

opined that Millard needed to lie down several hours each day. While Millard's testimony and those of her witnesses support her claim, the ALJ acted within her discretion in resolving this conflicting evidence. Where there is substantial evidence to support either position, the determination is one to be made by the factfinder. *Alston*, 904 F.2d at 126.

## V. Conclusion

The court DENIES Millard's motion (Doc. 12), GRANTS the Commissioner's motion (Doc. 16), and AFFIRMS the decision of the Commissioner.

Dated at Rutland, in the District of Vermont, this 19th day of November, 2014.

Geoffrey W. Crawford, Judge
United States District Court